UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT LEE, ) | |
| ) | |
| Plaintiff, ) | No. 14 C 06511 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| WOODLAWN COMMUNITY ) | |
| DEVELOPMENT CORPORATION and ) | |
| CHICAGO HOUSING AUTHORITY, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Robert Lee brings federal constitutional and Illinois common-law claims against the Chicago Housing Authority (CHA), and one of its real estate managers, Woodlawn Community Development Corporation. Lee alleges that the CHA and Woodlawn Community intentionally discriminated and retaliated against Lee based on his physical disabilities and requests for reasonable housing accommodations.[1] The CHA and Woodlawn Community separately moved to dismiss all of Lee's claims for failure to state a claim. R. 69, Woodlawn Community Mot. to Dismiss; R. 72, CHA Mot. to Dismiss.[2] The Court rejected the majority of the defense's arguments, and ordered a limited response from Lee. R. 76, October 20, 2015 Minute Entry. Three claims remain in dispute for dismissal-motion purposes: (1) a Section 1983 claim for violating the Fourteenth Amendment's due process clause based on

---

[1]This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.
[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

municipal liability against the CHA (Count Seven); (2) a Section 1983 claim for violating the Fourteenth Amendment's equal protection clause based on municipal liability against the CHA (Count Eight); and (3) an intentional infliction of emotional distress claim based on Illinois common law against both the CHA and Woodlawn Community (Count Ten).[3] For the reasons discussed below, Woodlawn Community's motion is denied and the CHA's motion is granted in part and denied in part.

## I. Background

For purposes of this motion, the Court accepts as true the allegations in Lee's Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Lee is a senior citizen who suffers from various physical disabilities, including chronic nerve damage and chronic pain and headaches. R. 68, Am. Compl. ¶¶ 7-8, 69. As a result of these physical conditions, Lee has undergone multiple surgeries and has limited mobility in his hands and arms. *Id.* ¶ 8. Lee receives Supplemental Security Income Disability Benefits from the Social Security Administration. *Id.*

In August 2011, Lee received a letter from Woodlawn Community informing him that he had reached the top of the CHA's public-housing waitlist and could begin applying for senior housing at Vivian Carter Apartments. Am. Compl. ¶ 6.

---

[3]In the October 20, 2015 minute entry, the Court noted that Lee's punitive damages claims against both the CHA and Woodlawn Community, *see* Am. Compl. ¶¶ 46, 50, 66, 70, were still in dispute. It appears, however, that the punitive damages issue is off the table for now: Woodlawn Community did not raise the issue in either its opening brief or its reply. *See Goffron v. Astrue*, 859 F. Supp. 2d 948, 958 (N.D. Ill. 2012) ("Arguments not raised are waived."). And, though the CHA did move to dismiss Lee's punitive damages claims, Lee clarified in his response brief that he is not in fact seeking punitive damages from the CHA. R. 77, Pl.'s Resp. Br. at 2 n.1.

Woodlawn Community managed Vivian Carter Apartments for the CHA, which oversees public housing within the City of Chicago. *Id.* ¶¶ 4-5. Lee notified Woodlawn Community that he would need a reasonable accommodation—that is, a larger apartment and preferably a bathtub—due to his physical disabilities. *Id.* ¶ 7. In response, Woodlawn Community told Lee that he would have to make an appointment, re-join the waitlist, and wait another year to qualify for public housing. *Id.* ¶ 9. After this communication, Lee repeatedly called Woodlawn Community to discuss a reasonable accommodation, but Woodlawn Community never returned his calls. *Id.*

In April 2012, Woodlawn Community told Lee that it had a vacant apartment for him. Am. Compl. ¶ 10. Lee went to see the apartment, which he alleges was in a "deplorable and unhealthy condition." *Id.* A Woodlawn Community employee told Lee that the apartment would be completely re-done before he moved in. *Id.* ¶ 11. When Lee brought up the reasonable accommodation request again, he was only told that Woodlawn Community had received his request. *Id.*

One month later, Woodlawn Community notified Lee that his apartment was brand new and move-in ready. Am. Compl. ¶ 12. According to Lee, the apartment was in fact not brand new, but he had no choice so he moved into it. *Id.* ¶¶ 12-13. Lee signed a CHA lease with the understanding that Woodlawn Community would resolve any outstanding issues he had with the apartment. *Id.* ¶ 13.

Even after he moved into his apartment, Lee continued to ask Woodlawn Community for a reasonable accommodation. Am. Compl. ¶ 14. In response,

3

Woodlawn Community allegedly began retaliating against Lee. *Id.* ¶ 15. For example, Woodlawn Community repeatedly failed to properly repair Lee's bathroom sink, which fell off his wall five times within one year. *Id.* Not only did Woodlawn Community refuse to timely complete repairs in Lee's apartment, but eventually it refused to even accept Lee's repair requests. *Id.* According to Lee, Woodlawn Community also retaliated against him by refusing to allow Lee's visitors into the building, monitoring Lee's movements, and meddling with Lee's mail. *Id.* ¶ 16.

In January 2014, Lee filed a grievance with the CHA based on Woodlawn Community's refusal to handle Lee's request for a reasonable accommodation and the retaliation that had ensued. Am. Compl. ¶ 17. The CHA never held a hearing to address this grievance. *Id.* Six months later, Woodlawn Community initiated eviction proceedings against Lee for failing to pay rent. *Id.* ¶ 18. Woodlawn Community knew, however, that Lee had actually withheld rent in response to Woodlawn Community's refusal to attend to Lee's reasonable accommodation request and the other outstanding issues Lee had with the apartment. *Id.*

Lee asserts ten counts in the Amended Complaint: (1) discrimination based on disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.* against the CHA (Count One); (2) retaliation in violation of the ADA, 42 U.S.C. § 12101, *et seq.* against the CHA (Count Two); (3) discrimination based on disability in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* against the CHA (Count Three); (4) retaliation in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* against the CHA (Count Four); (5)

4

discrimination based on disability in violation of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3604 *et seq.* against the CHA and Woodlawn Community (Count Five); (6) intimidation and interference in violation of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3604 *et seq.* against the CHA and Woodlawn Community (Count Six); (7) Section 1983 municipal liability claim for violation of the Fourteenth Amendment's due process clause against the CHA (Count Seven); (8) Section 1983 municipal liability claim for violation of the Fourteenth Amendment's equal protection clause against the CHA (Count Eight); (9) Illinois common law fraudulent inducement claim against the CHA and Woodlawn Community (Count Nine); and (10) Illinois common law intentional infliction of emotional distress claim against the CHA and Woodlawn Community (Count Ten).

The CHA and Woodlawn Community separately moved to dismiss all counts, but the Court denied the bulk of the arguments, *see* October 20, 2015 Minute Entry, leaving for decision only the Section 1983 claims against the CHA (Counts Seven and Eight) and the emotional-distress claim against the CHA and Woodlawn Community (Count Ten).

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original)

5

(internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

**A. Section 1983 Claims Against Chicago Housing Authority**

In Counts Seven and Eight, Lee seeks to hold the CHA liable for violating his Fourteenth Amendment procedural due process and equal protection rights. Am. Compl. ¶¶ 51-62. Municipal liability is permitted under Section 1983 in one of three ways:

> A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or

6

custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority.

*Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010); *Monell v. N.Y. City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978). Lee premises his *Monell* claims on the second ground for municipal liability: a widespread, but unofficial, practice. Am. Compl. ¶¶ 20, 54, 60; R. 77, Pl.'s Resp. Br. at 2-4. He claims that the CHA had a widespread practice of failing to train and supervise its employees on how to "handl[e] … requests for reasonable accommodations through the grievance process or otherwise." Am. Compl. ¶ 20. To support his failure-to-train theory, Lee asserts that not only was he denied a hearing for his grievance, but that "[r]equests for reasonable accommodation submitted by other residents of the Vivian Carter Apartments were likewise ignored and resulted in retaliation." *Id.* ¶¶ 19-20. In response, the CHA contends that Lee "rests his § 1983 claims [on] the conclusory allegation that the CHA failed to 'provide adequate training and/or supervision' to [Woodlawn Community] personnel … ." R. 79, CHA Reply at 3 (citation omitted). Put another way, the CHA contends that the Amended Complaint does not provide sufficient facts to plausibly infer a "widespread" practice; rather, at most it alleges a "practice affecting only one … development[] and only one … property manager[] and an unidentified number of residents … ." *Id.* at 5.

To state a widespread-practice claim, Lee must allege a series of constitutional violations showing that the CHA was "aware of the risk created by the custom or practice and … failed to take appropriate steps," *Thomas*, 604 F.3d at 303, or that the risk was "so obvious" that the CHA's policymakers should have

known about the risk, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). *See also Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001) ("The complaint does not allege any facts tending to show that City policymakers were aware of the behavior of the officers, or that the activity was so persistent and widespread that City policymakers should have known about the behavior."). The widespread practice must be "the moving force behind the constitutional violation." *Harris*, 489 U.S. at 389 (internal quotations and brackets omitted). This is because the CHA "cannot be held liable … on a respondent superior theory"—in other words, "solely because it employs a tort-feasor." *Monell*, 436 U.S. at 691; *Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir. 1992) ("Municipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents.").

It is only "[i]n limited circumstances" that a training deficiency will give rise to a widespread-practice claim. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). This is because a municipality's failure to train must amount to "deliberate indifference to the rights of persons with whom the [municipality's untrained employees] come into contact." *Harris*, 489 U.S. at 388; *Connick*, 563 U.S. at 61 ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." (internal quotation marks and citation omitted)); *Sornberger v. City of Knoxville, Illinois*, 434 F.3d 1006, 1029 (7th Cir. 2006) ("Establishing *Monell*

liability based on evidence of inadequate training or supervision requires proof of 'deliberate indifference' on the part of the local government."). Deliberate indifference in the failure-to-train context may be established by showing "either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its [employees]." *Sornberger*, 434 F.3d at 1029-30.

In the Amended Complaint, Lee alleges that the CHA failed to "provide[] adequate training and/or supervision to its … agents regarding the handling of requests for reasonable accommodations through the grievance process or otherwise." Am. Compl. ¶ 20. He further alleges that "[r]equests for reasonable accommodation submitted by other residents of the Vivian Carter Apartments were likewise ignored and resulted in retaliation." *Id.* ¶ 19. These allegations are not specific enough to survive a motion to dismiss. To be sure, Lee's *Monell* claims are not subject to any heightened pleading standard, *see Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993), and "mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss*," Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir. 1985). But only well-pleaded *factual* allegations are entitled to a presumption of truth. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) ("In reviewing the sufficiency of a complaint under the plausibility standard announced in *Twombly* and *Iqbal*, we accept the well-pleaded facts in the complaint as true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to

this presumption of truth."). And here, the Amended Complaint is lacking in factual sufficiency. No facts are alleged about the "other residents" who also requested a reasonable accommodation: Who are these "other residents"? How many of them are there? What disabilities did they have? What reasonable accommodation requests did they make and to whom? What forms of retaliation did they experience? Did they file grievances with the CHA? Were these residents also evicted from Vivian Carter Apartments? Merely alleging that other residents' requests for reasonable accommodation were ignored fails, at that too-high level of generality, "to present a story that holds together" of deliberate indifference to disabled residents' constitutional rights. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). This lack of factual specificity concerning other similar constitutional violations is fatal to Lee's claims.[4] *See Winchester v. Marketti*, 2012 WL 2076375, at *4 (N.D. Ill. June 8, 2012) (dismissing plaintiff's *Monell* claim based on a failure-to-train theory because "[p]laintiff ma[de] no attempt to plead a pattern of similar constitutional violations with any degree of factual specificity").

---

[4] Lee's *Monell* claim for violation of his procedural due process rights (Count Seven) is even more fact-deficient. Lee alleges that "[d]uring his tenancy, [he] had not been given any form of due process, including without limitation, a formal or informal hearing in accordance with CHA's grievance procedure before he was deprived of his protected property interest." Am. Compl. ¶ 53. Though Lee alleges that he did not receive a grievance hearing, he fails to allege that other disabled residents also did not receive a hearing after filing a CHA grievance. And Lee's allegation that "other residents … were likewise ignored," *id.* ¶ 19, is not enough to establish repeat constitutional violations such that the Court can infer that the CHA deliberately implemented inadequate training or supervisory policies. *See Harris v. Sandoval*, 2015 WL 1727283, at *3 (N.D. Ill. Apr. 13, 2015) (holding that "Plaintiff does not allege other similar constitutional violations from which a plausible inference could be drawn that the City deliberately implemented inadequate training, hiring, or supervisory policies or customs that caused police misconduct, including the alleged beating that Plaintiff suffered").

There is another form of factual-allegation deficiency: the Amended Complaint fails to allege that anyone at the CHA was *aware* that Woodlawn Community employees failed to reasonably accommodate disabled residents. In *Pindak v. Cook County*, the district court dismissed a *Monell* claim because the plaintiff failed to adequately allege that the Public Housing Commission "was aware that First Amendment violations were likely, but deliberately chose not to train employees." 2013 WL 1222038, at *8 (N.D. Ill. Mar. 25, 2013). The Public Building Commission had contracted with third-parties[5] to provide security officers on Chicago's Daley Plaza and the plaintiff alleged that these officers "routinely interfere[d] with his peaceful panhandling activity … ." *Id.* at *1, 8. The district court observed that the plaintiff failed to assert "that anyone at [Public Building Commission] had knowledge that Securitas officers allegedly interfered with Plaintiff's panhandling," or "any specific facts about the training [Public Building Commission] employees or agents received." *Id.* at *8. Because "[n]othing in the record suggest[ed] that [Public Building Commission] made a *deliberate* choice not to train employees about obvious constitutional threats," the district court dismissed the plaintiff's *Monell* claim. *Id.* (emphasis in original); *see also Harris*, 489 U.S. at 389 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983."). Like the plaintiff in *Pintak*, Lee does not allege in his Amended Complaint that the CHA was aware that Fourteenth

---

[5]The Public Building Commission contracted with MB Real Estate Services, LLC to provide security on Daley Plaza. *Id.* at *1. MB Real Estate Services, in turn, contracted with Securitas Security Services USA, Inc. to provide officers to police the Plaza. *Id.*

11

Amendment violations were likely, yet deliberately chose not to train Woodlawn Community's employees. And as in *Pintak*, the Amended Complaint is void of any facts about the training that CHA employees and agents received. In sum, the *Monell* claims cannot stand without any factual basis from which to plausibly infer that the CHA was deliberately indifferent to the need for training. Counts Seven and Eight must be dismissed.

### B. Emotional-Distress Claim Against the Defendants

The only other claim at issue is common-law intentional infliction of emotional distress against both the CHA and Woodlawn Community. To state a claim for emotional distress in Illinois, a plaintiff must show: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that his conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988); *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866 (Ill. App. Ct. 2000); *accord Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001).

The crux of the Defendants' argument here is that "the Amended Complaint contains no allegations that rise to 'extreme or outrageous conduct.'" R. 73, CHA Br. at 13; R. 78, Woodlawn Community Reply at 2 ("Contrary to [Lee's] assertions in his response, Count [Ten] of the Complaint fails to establish 'extreme and outrageous' conduct that meets the high standard required to state an [emotional-distress] claim."). The defense also argues that Lee's allegation that he "suffered damages,

including, but not limited to, severe emotional and physical distress," Am. Compl. ¶ 70, is not enough to state an actionable emotional-distress claim. CHA Br. at 13; Woodlawn Community Reply at 4. Lee counters that the Defendants' conduct was extreme and outrageous: Not only did Woodlawn Community repeatedly ignore Lee's requests for a reasonable accommodation, but it also refused to timely repair Lee's apartment, accept damages reports from Lee, and allow Lee's visitors into the building.[6] Am. Compl. ¶¶ 14-16; Pl.'s Resp. Br. at 5-6. Lee alleges that Woodlawn Community also monitored Lee's movements, meddled with his mail, and eventually tried to evict him. Am. Compl. ¶¶ 16, 18.

To satisfy the element of extreme and outrageous conduct, the conduct "must be so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80-81 (Ill. 2003). Courts routinely recognize that "repetition of the behavior may be a critical factor in raising offensive acts to actionably outrageous ones." *Pavlik v. Kornhaber*, 761 N.E.2d 175, 187 (Ill. App. Ct. 2001); *Feltmeier*, 798 N.E.2d at 83 ("A pattern, course, and accumulation of acts can make an individual's conduct 'sufficiently extreme to be actionable, whereas one instance of such behavior might not be.'" (quoting *Pavlik*, 761 N.E.2d at 187)); *accord Lujano v. Town of Cicero*, 691 F. Supp. 2d 873, 886 (N.D. Ill. 2010) ("[I]t is important to note that even if none of Rocher's actions would be actionable when considered individually, his conduct can

---

[6]Based on the Amended Complaint, Lee appears to contend that the CHA is liable on the emotional-distress claim based on respondeat superior liability. *See* Am. Compl. ¶¶ 68-69 (alleging that "Woodlawn [Community], on its own behalf and as an agent of the CHA" intentionally engaged in extreme and outrageous conduct).

13

reach the necessary level of egregiousness when taken as a whole."). For example, in *Pavlik v. Kornhaber*, an Illinois court held that the plaintiff sufficiently stated an emotional-distress claim based on the defendant's "cumulative pattern of offensive conduct." 761 N.E.2d at 186. The court decided that "based on the well-pleaded facts in plaintiff's complaint, a jury could conclude that defendant's notes, sexually explicit comments, insistence on meetings the subject of which was his desire for sexual contact, and lewd behavior in an employer-employee relationship" constituted extreme and outrageous behavior. *Id. Pavlik* exemplifies the need to evaluate emotional-distress claims based on the totality of the alleged conduct, not just as isolated events. The same reasoning applies here: the *totality* of Woodlawn Community's conduct—which allegedly included ignoring Lee's repeat accommodation requests, refusing to properly repair the sink in Lee's apartment, refusing to accept damage reports from Lee, refusing to allow Lee's visitors into the building, tracking Lee's comings and goings, meddling with Lee's mail, and trying to evict Lee—is enough to meet the extreme and outrageous threshold. So, Lee's allegations as to the *cumulative* nature of Woodlawn Community's conduct is enough to survive the motions to dismiss. The Court hastens to add, however, that Lee ultimately will bear the burden of *proving* these allegations with actual evidence, and that a dismissal-motion decision is based on an assumption that the allegations are true.

In addition to the totality of a defendant's conduct, courts also consider a number of other factors when analyzing the element of extreme and outrageous

14

conduct, including: whether the defendant was in a position of power over the plaintiff; whether the defendant reasonably believed that his objectives were legitimate; and whether the defendant was aware that the plaintiff was particularly susceptible to emotional distress. *McGrath*, 533 N.E.2d at 809-11. All three of these factors further lend support to Lee's emotional-distress claim, at least at the dismissal-motion stage. First, Woodlawn Community was in a position of power over Lee as the manager of his apartment. *See Myers v. Condominiums of Edelweiss, Inc.*, 2013 WL 4597973, at *8 (N.D. Ill. Aug. 29, 2013) (finding it persuasive that "Defendants took advantage of their management role to pursue an eviction action against Myers following her request for an accommodation"). Second, Woodlawn Community cannot plausibly argue that it had a legitimate objective in mind when it (allegedly) disregarded Lee's accommodation requests and retaliated against him. Woodlawn Community asserts that the eviction proceedings were "for the legitimate reason that [Lee] failed to pay rent," not because Lee requested a reasonable accommodation. Woodlawn Community Reply at 3. But Lee alleges that he withheld rent because Woodlawn Community refused to make reasonable accommodations for him and repair his apartment. Am Compl. ¶ 18. If this allegation proves true, Lee's withholding of rent in response to the alleged discrimination and retaliation might not qualify as a "legitimate reason" for trying to evict him. And even if initiating eviction proceedings for Lee's failure to pay rent was justified, Woodlawn Community still cannot explain away (at least at this stage of the litigation) its alleged course of conduct *before* Lee withheld rent. Finally,

15

Woodlawn Community was aware that Lee was susceptible to emotional distress given that he is a disabled senior citizen who stood to lose his housing—one of life's basic necessities. *See Jenkins v. Nat'l R.R. Passenger Corp.*, 2008 WL 68685, at *2 (N.D. Ill. Jan. 3, 2015) (holding that the plaintiff adequately pled an emotional-distress claim in part because the plaintiff was disabled and in need of accommodations).

Woodlawn Community makes much of the fact that Lee's emotional-distress claim only alleges that he "suffered damages, including, but not limited to, severe emotional and physical distress." Am. Compl. ¶ 70; *see also* CHA Br. at 13; Woodlawn Community Reply at 4. To be sure, Lee's allegations on this issue are lacking factual detail. And again, Lee will need evidence showing that he suffered severe emotional distress in order for his claim to survive summary judgment. But the sheer nature of Woodlawn Community's course of conduct, *see supra* at Section III.B. at 12-16, in conjunction with Lee's allegation that he suffered severe emotional and physical distress, is enough for the Court to infer that Lee has stated an adequate claim relief. *See Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 213 (Ill. 1992) (holding that "[t]he facts alleged in support of the outrageous character of the defendants' conduct are sufficient to support the additional allegation that the plaintiffs suffered severe emotional distress as a result of that conduct"); *Duffy v. Orlan Brook Condo. Owners' Ass'n*, 981 N.E.2d 1069, 1081 (Ill. App. Ct. 2012) (observing that "allegations establishing extreme and outrageous conduct will, at times, in themselves also establish that the plaintiff suffered severe emotional

distress"); *see also Jenkins*, 2008 WL 68685 at *9 (concluding that the plaintiff's allegations that the defendant's conduct "left her embarrassed, humiliated and outraged, and caused severe and extreme emotional distress" were sufficient to survive a motion to dismiss "when considered in conjunction with the allegations regarding the incident at issue").

Just a quick final word on an alternative argument presented by the CHA. The CHA makes much of the fact that Lee's Amended Complaint is void of any facts suggesting that *CHA*—as opposed to Woodlawn Community—engaged in extreme and outrageous conduct. CHA Reply Br. at 8 ("More importantly, however, Plaintiff cannot identify any allegations in the Amended Complaint that could be considered to be 'extreme or outrageous conduct'—or any of the *other* elements of [an emotional-distress claim], for that matter—by the CHA."). The problem with this argument, however, is that the CHA may be held liable for Woodlawn Community's intentional infliction of emotional distress under the theory of respondeat superior. *See Sunseri v. Puccia*, 422 N.E.2d 925, 930 (1981); *accord Listenbee v. City of Harvey*, 2013 WL 5567552, at *5 (N.D. Ill. Oct. 9, 2013); *Otterbacher v. Northwestern Univ.*, 838 F. Supp. 1256, 1262 (N.D. Ill. 1993). Because the CHA may be liable under respondeat superior for its agent's extreme and outrageous conduct, the Court will not dismiss Lee's emotional-distress claim against it at this time.

## IV. Conclusion

For the reasons discussed, the CHA's motion to dismiss, R. 72, is granted in part and denied in part, and Woodlawn Community's motion to dismiss, R. 69, is denied.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: May 25, 2016